IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Basil Jacob Kyles, ) | |
| ) | Civil Action No. 6:13-2235-JMC-KFM |
| Plaintiff, ) | |
| ) | |
| vs. ) | **REPORT OF MAGISTRATE JUDGE** |
| ) | |
| Kenny Atkinson and Alex A. Chartier, ) | |
| ) | |
| Defendants. ) | |
| ) | |

This matter is before the court on the defendants' motion to dismiss or, in the alternative, for summary judgment (doc. 23). The plaintiff is a prisoner at the United States Penitentiary in Leavenworth, Kansas. The allegations in his complaint arose while he was incarcerated at the Federal Correctional Institution in Edgefield, South Carolina ("FCI Edgefield"), which is part of the Federal Bureau of Prisons ("BOP"). Defendant Chartier is the Supervisory Chaplain at FCI Edgefield, and the defendant Atkinson is the Warden at FCI Edgefield. The plaintiff is proceeding *pro se* and seeks relief pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).[1]

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A) and Local Civil Rule 73.02(B)(2)(e) DSC, this magistrate judge is authorized to review pretrial matters in cases involving *pro se* litigants and submit findings and recommendations to the District Court.

On November 19, 2013, the defendants filed a motion to dismiss or, in the alternative, for summary judgment (doc. 23). By order filed the next day, pursuant to

---

[1] In *Bivens*, the Supreme Court established a cause of action against federal officials for the violation of federal constitutional rights. A *Bivens* claim is analogous to a claim under 42 U.S.C. § 1983. *Harlow v. Fitzgerald*, 457 U.S. 800, 814–20 (1982). Case law involving § 1983 claims is applicable in *Bivens* actions and vice versa. *Id*. See also *Osabutey v. Welch*, 857 F.2d 220, 221–223 (4th Cir.1988).

*Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975), the plaintiff was advised of the motion to dismiss and summary judgment procedures and the possible consequences if he failed to respond adequately. On January 6, 2014, the plaintiff filed a response in opposition (doc. 30).

## BACKGROUND

The plaintiff is a federal prisoner who was sentenced on September 9, 1993, to a 262-month term of imprisonment by the United States District Court for the District of Connecticut. His projected release date is November 24, 2016, via Good Conduct Time release.

The plaintiff alleges the defendants have violated his First Amendment rights and the Religious Freedom Restoration Act ("RFRA") because they denied him the opportunity to properly worship as a Hebrew Messianic Yisraelite (doc. 1-1 at pp. 7-15). The plaintiff seeks $250,000 in damages from each of the defendants (doc. 1 at p. 6).

## FACTS PRESENTED

The BOP Program Statement 5360.09, Religious Beliefs and Practices, dated December 31, 2004, governs inmate religious practices within the BOP institutions (doc. 23-1, Program Statement 5360.09). This policy provides inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices, within the constraints of budgetary limitations and consistent with the security and orderly running of the institution and BOP (*id.*). Opportunities for religious activities are open to the entire inmate population, without regard to race, color, nationality, or ordinarily creed (*id.*). The level of scheduled religious activities are commensurate with the individual institution's mission/need (*id.*).

The FCI Edgefield Religious Services Department has three chaplains to provide religious services to approximately 1800 inmates (doc. 23-2, Chartier decl. ¶ 3). There are several religious faith groups at FCI Edgefield for which the Religious Services

Department provide equal worship and study time (*id.*).  According to defendant Chartier, the Supervisory Chaplain of FCI Edgefield, since the Hebrew Messianic Yisraelite faith is very similar to the Jewish faith, it was decided that basic worship services and other religious accommodations were to be provided to Hebrew Messianic Yisraelites under the umbrella of the Judaism faith group (i*d*. ¶ 4).  Chaplain Chartier states in his declaration that the practice of placing several similar religious denominations under the umbrella of one faith group is not unique to the BOP, and this practice is applied to several other single denominations of faith in order to be able to meet the religious needs of each faith group in a fair and equitable manner (*id*.)

Chaplain Chartier further states in his declaration that because of the limited time and resources available to the FCI Edgefield Religious Services Department, it was impractical to provide time and space for a separate worship service accommodation to one practitioner whose religious practices were similar to a larger faith group that already had scheduled times and space for worship (*id*. ¶ 5). Thus, the plaintiff was offered the option to welcome in the Sabbath on Friday evenings with those of the Jewish faith; however, the plaintiff declined the offer (*id*.).  The plaintiff was informed that since he declined to welcome the Sabbath with the Judaism faith group, he could perform his religious observance as an individual practitioner (*id*.). This gave the plaintiff the opportunity to receive books and other religious items related to his faith tradition and gave him the opportunity to practice his religious observances on his own without any interference (*id*.).

According to Chaplain Chartier, after the plaintiff's initial requests, the Messianic faith group increased in size, and, in an effort to further accommodate this faith group, time and space was reserved on Saturdays between 2:00 p.m. and 3:00 p.m. for them to conduct separate worship services in the chapel area (*id*. ¶ 6).  Beginning in January 2013, the Hebrew Messianic Yisraelite faith group at FCI Edgefield was provided with time and space in the chapel area to conduct a separate Sabbath service on Friday

evenings (*id*.). According to Chaplain Chartier, the limited time and resources of the FCI Edgefield Chaplaincy did not make it practical to have separate worship services at different locations for two distinct but very similar faith groups when there was only one Messianic practitioner; however, as the Messianic faith group increased in size, more accommodations have been made to provide the plaintiff and other Messianic practitioners with more than a reasonable opportunity to practice their religious beliefs (*id.* ¶ 7).

The plaintiff disputes that the Hebrew Messianic Yisraelite and Jewish faiths are similar faith groups and contends that, in only allowing him to observe the bringing in of the Sabbath in a combined service with the Jewish congregation, the defendants substantially burdened the exercise of his religion (doc. 30, pl. resp. m.s.j. at pp. 3-6). The plaintiff alleges in his complaint that he emailed Chaplain Chartier in February 2012 to complain that he was not being allowed to properly worship by welcoming in the Sabbath on Friday afternoons. On March 3, 2012, he sent an email to Warden Atkinson regarding the same (doc. 1-1, comp. mem. at p. 7). The plaintiff disputes that he was the only Hebrew Yisraelite practicing at FCI Edgefield at that time (*id.* at p. 8). He claims that defendant Chartier violated his rights by scheduling the Hebrew Yisraelites for worship on Saturday afternoons rather than on Fridays (*id.* at p. 9). The plaintiff agrees that as of January 2013 the Hebrew Yisraelites have been allowed to welcome the Sabbath on Fridays (*id.* at p. 10).

## **APPLICABLE LAW AND ANALYSIS**

As matters outside the pleadings have been presented to and not excluded by the court, the defendants' motion will be treated as one for summary judgment. Fed. R. Civ. P. 12(d). Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is

deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The plaintiff alleges that the defendants have violated his free exercise of religion rights under the First Amendment and the RFRA. "The Free Exercise Clause of the First Amendment forbids the adoption of laws designed to suppress religious beliefs or practices," and "[i]ts protections . . . extend[] to the prison environment." *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001) (citations omitted). To state an actionable claim under the Free Exercise Clause, a plaintiff must show both that he sincerely held a religious belief and that the defendant's actions substantially burdened his religious freedom

5

or expression. *Blue v. Jabe*, 996 F. Supp. 499, 502 (E.D. Va.1996) (citing *Wisconsin v. Yoder*, 406 U.S. 205, 215–216 (1972)). The Supreme Court has defined "substantial burden" in a variety of ways, including "putting substantial pressure on an adherent to modify his behavior and violate his beliefs," *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717–18 (1981), and forcing an individual to "choose between following the precepts of [his] religion and forfeiting benefit, on the one hand, and abandoning one of the precepts of [his] religion ... on the other." *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).

The RFRA "prohibits '[g]overnment' from 'substantially burden[ing]' a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.' " *City of Boerne v. Flores*, 521 U.S. 507. 515–16 (1997) (quoting 42 U.S.C. § 2000bb–1). As with a First Amendment claim, a plaintiff seeking to state a claim under the RFRA must first show the government has substantially burdened the exercise of his religion. *Woods v. Evatt*, 876 F.Supp. 756, 762 (D.S.C.1995). The burden placed on the religious exercise "must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Graham v. C.I.R.*, 822 F.2d 844, 851 (9th Cir. 1987).

The plaintiff's claims under the First Amendment and the RFRA fail because he has not shown that the defendants substantially burdened the exercise of his religion. Here, the plaintiff was offered the option to welcome in the Sabbath on Friday evenings with members of the Judaism faith group as "it was impractical to provide time and space for a separate worship service accommodation to one practitioner whose religious practices were similar to a larger faith group that already had scheduled times and space for worship" (doc. 23-2, Chartier decl. ¶ 5). While the plaintiff claims that he was not the only Hebrew

Yisraelite practicing at FCI Edgefield at that time (doc. 1-1, comp. mem. at p. 8), he has presented no evidence in support of this allegation. The Supreme Court of the United States has stated, "We do not suggest . . . that every religious sect or group within a prison - however few in number - must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972).

Moreover, courts have consistently held interfaith religious services to be sufficient, as long as there is a reasonable relationship between the service and the tenets of the subsidiary sects. *Weir v. Nix*, 114 F.3d 817, 820-21 (8th Cir. 1997) (fact that Protestant minister conducted inclusive Protestant services, which were against inmate's exclusive beliefs, was not enough for the inmate to get a separate service, where the minister's beliefs mirrored the inmate's beliefs in all other respects); *Clifton v. Craig*, 924 F.2d 182, 184 (10th Cir. 1991) (no requirement that Church of Christ services be held separately when there are services for Christians); *Searcy v. Broome*, C.A. No. 6:07-cv-0154-GRA-WMC, 2007 WL 4443062, at *10 (D.S.C. Dec. 14, 2007) (failure to provide separate worship service for Mennonite inmates did not substantially burden inmate's religious exercise). The rationale for these holdings is that "the large number of religious groups represented in the prison population and such factors as security, staffing, and space" can make separate services for all groups logistically infeasible. *Clifton*, 924 F.2d at 185.

The plaintiff admits that the customs of worship for his faith are similar to that of the Jewish faith, and his faith requires that "the standard of the Jews" must be followed "as it relates to bringing in and welcoming the Sabbath day" (doc. 1-1, comp. mem. at p. 9). However, the plaintiff states the "prayers are different" and "welcoming the Sabbath with a group which rejects their Messiah . . . is a great offense to Messianic/Yisraelites, even

7

though we have customs of worship that are similar" (*id.* at pp. 9-10). Furthermore, in support of his argument that a combined service violates his rights, the plaintiff cites the *Complete Jewish Bible* in stating that it is "the practice of Judaism" to use "only the titles God or Lord to refer to our Creator," while "for Messianic Hebrew Yisraelites, the use of the title God or Lord to refer to our Creator is strictly forbidden" (doc. 30, pl. resp. m.s.j. at p. 4).

When the plaintiff declined to welcome in the Sabbath on Friday evenings with members of the Jewish faith, the plaintiff was informed that he could perform his religious observance as an individual practitioner (doc. 23-2, Chartier decl. ¶ 4). According to Chaplain Chartier, this provided the plaintiff with the opportunity to receive books and other religious items and to practice his religious observances on his own without any interference (*id.*). *See Lee v. Johnson*, 793 F.Supp.2d 798, 806 (W.D. Va. 2011) (holding that prison policy that allowed for group worship only if a minimum of five inmates expressed interest in such services did not substantially burden religious rights of prisoner); *Searcy*, 2007 WL 4443062, at *10 (noting that requiring a separate service for a single person would be "a tremendous burden" on the prison). The plaintiff states in his response to the motion for summary judgment that he is required to light candles and to recite certain prayers in bringing in the Sabbath and that the lighting of the candles can only be done in the chapel (doc. 30, pl. resp. m.s.j. at p. 6). However, he has submitted no evidence supporting this conclusion rather than his bare statement. "A conclusory, unsupported, unsworn statement by the plaintiff is insufficient to thwart summary judgment." *Crosley-El v. Berge*, 896 F. Supp. 885, 889 (E.D. Wis. 1995). Moreover, it is undisputed that once the Hebrew Messianic Yisraelite faith group grew in size, they were given time and space in the chapel on Saturday afternoons, and, beginning in January 2013, they were provided time and space in the chapel to conduct a separate Sabbath service on Friday evenings (doc. 23-2, Chartier decl. ¶ 6). Based upon the foregoing, the plaintiff has failed to show that the defendants substantially burdened his ability to practice his faith or put pressure on him to

modify his behavior and to violate his beliefs. Accordingly, summary judgment should be granted on his claims under the First Amendment and the RFRA.

Furthermore, even if the plaintiff had satisfied his burden of showing that the defendants substantially burdened the exercise of his religion, summary judgment would still be appropriate because the defendants have made the required showings under the First Amendment and the RFRA. In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court of the United States held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id*. at 89. This standard represents a " 'reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.' " *Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (quoting *O'Lone v. Shabazz*, 482 U.S. 342, 349 (1987)). The *Turner* Court identified four factors that are relevant in determining the reasonableness of a challenged prison regulation:

> 1. there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
>
> 2. whether there are alternative means of exercising the right that remain open to prison inmates;
>
> 3. the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
>
> 4. whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Turner*, 482 U.S. at 89–91. When considering the constitutionality of prison regulations, courts are deferential to the choices made by prison administrators. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the

legitimate goals of a corrections system and for determining the most appropriate means to accomplish them.").

Under the RFRA, once the plaintiff makes a showing that the government has substantially burdened his exercise of religion, the government then must show the burden was placed on the exercise of religion "in furtherance of a compelling governmental interest" and there was no less restrictive means to further that governmental interest. 42 U.S.C. § 2000bb–1(b).

BOP policy provides inmates of all faith groups with reasonable and equitable opportunities to pursue religious beliefs and practices, within the constraints of budgetary limitations and consistent with the security and orderly running of the institution and BOP (doc. 23-1, Program Statement 5360.09). Controlling prison costs is a compelling government interest. Chaplain Chartier states in his declaration that FCI Edgfield's Religious Services Department has only three chaplains to provide religious services to approximately 1800 inmates. Because of the limited time and resources available to the FCI Edgefield Religious Services Department, it was impractical to provide time and space for a separate worship service accommodation to one practitioner whose religious practices were similar to a larger faith group that already had scheduled times and space for worship. The plaintiff was also afforded other avenues and opportunities to practice his faith. The plaintiff was offered the option to welcome in the Sabbath on Friday evenings with those of the Jewish faith; however, the plaintiff declined the offer. The plaintiff was then informed that since he declined to welcome the Sabbath with the Judaism faith group, he could perform his religious observance as an individual practitioner. This gave the plaintiff the opportunity to receive books and other religious items related to his faith tradition and gave him the opportunity to practice his religious observances on his own without any interference. Thereafter, when the Messianic faith group slightly increased in size, and, in an effort to further accommodate this faith group, time and space was reserved on

Saturdays between 2:00 p.m. and 3:00 p.m. for them to conduct separate worship services in the chapel area, and beginning in January 2013, the Hebrew Messianic Yisraelite faith group at FCI Edgefield was provided with time and space in the chapel area to conduct a separate Sabbath service on Friday evenings (doc. 23-2, Chartier decl. ¶¶ 2-6).

As the defendants have shown, as the Messianic faith group increased in size, more accommodations have been made to provide the plaintiff and other Messianic practitioners with more than a reasonable opportunity to practice their religious beliefs. Based upon the foregoing, the undersigned finds that the defendants' actions constituted the least restrictive means of furthering a compelling government interest as required by the RFRA and further finds that the *Turner* factors weigh in the defendants' favor on the First Amendment claim. *See Hall v. Martin*, No. 1:11cv416, 2012 WL 1536457, at *2-6 (W.D. Mich. Mar. 15, 2012) (recommending granting prison officials' motion for summary judgment on inmate's claims that denial of request for separate Messianic Jewish service violated the RLUIPA and First Amendment), *adopted by* 2012 WL 1537409, at *2-3 (W.D. Mich. May 1, 2012). *See also Lindh v. Warden, Fed. Corr. Inst., Terre Haute, Ind.*, No. 2:09-cv-215-JMS-MJD, 2013 WL 139699, at *8 (S.D. Ind. Jan. 11, 2013) ("Because of their substantial similarity, both RFRA and RLUIPA cases are relied on by the Court interchangeably."). Accordingly, summary judgment should be granted on both claims.

***Supervisory Liability***

The plaintiff alleges that he sent an email to Warden Atkinson in March 2012 requesting that Chaplain Chartier change the chapel schedule so that "Messianic Sabbatarians" could bring in the Sabbath on Friday rather than Saturday afternoon (doc. 1-2, comp. mem. at p. 7; doc. 1-4, email). This is the only allegation made against Warden Atkinson. In support of the motion for summary judgment, Warden Atkinson submitted a declaration stating that he has no knowledge of the alleged acts set forth in the amended complaint, he did not see the plaintiff's administrative remedy regarding his allegations, and

he did not sign the response to the administrative remedy. The response was signed by one of Warden Atkinson's executive staff members serving as Acting Warden. Moreover, Warden Atkinson states that he doe not recall personally seeing the email the plaintiff claims to have sent to his office (doc. 23-3, Atkinson decl. ¶¶ 3-4; *see* doc. 1-2 at p. 9, admin. remedy resp.). The plaintiff has submitted no evidence supporting his allegation that the Warden violated his constitutional rights.

To the extent the plaintiff seeks to hold Warden Atkinson liable in his supervisory capacity, the doctrine of respondeat superior generally is inapplicable to Section 1983 or *Bivens* suits. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Vinnedge v. Gibbs*, 550 F.2d 926, 928-29 (4th Cir. 1977). The plaintiff must establish three elements to hold a supervisor liable for a constitutional injury inflicted by a subordinate: (1) the supervisor had actual or constructive knowledge that a subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to people like the plaintiff; (2) the supervisor's response was so inadequate as to constitute deliberate indifference or tacit authorization of the subordinate's conduct; and (3) there is an "affirmative causal link" between the supervisor's inaction and the plaintiff's constitutional injury. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). The plaintiff has failed to make the required showing here. Accordingly, Warden Atkinson is entitled to summary judgment on this basis as well.

***Qualified Immunity***

The defendants further argue that they are entitled to qualified immunity as their conduct did not violate any clearly established constitutional or statutory rights of which a reasonable person should have known. This court agrees. Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). This qualified

immunity is lost if an official violates a constitutional or statutory right of the plaintiff that was clearly established at the time of the alleged violation so that an objectively reasonable official in the defendant's position would have known of it. Id.  In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Wilson v. Layne*, 526 U.S. 603, 609 (1999).  As discussed above, the plaintiff has failed to show that the defendants violated his constitutional rights. Therefore, the defendants are entitled to the protections afforded by the doctrine of qualified immunity.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the defendants' motion for summary judgment (doc. 23) be granted.

s/ Kevin F. McDonald
United States Magistrate Judge

May 21, 2014
Greenville, South Carolina

13

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4$_{th}$ Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Robin L. Blume, Clerk
> United States District Court
> 300 East Washington Street
> Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).